| | |
|---|---|
| Paul Edward Johnson, | File No. 24-cv-1065 (ECT/DJF) |
| Plaintiff, | |
| v. | **OPINION AND ORDER** |
| Kevin Stahl, *Chief of Police for the City of Braham*; Tyler Johnson, *Officer Braham PD*; and Kevin Lease, *Officer Braham PD, sued in their official and individual capacities*; and City of Braham. | |
| Defendants. | |

Paul Edward Johnson, Pro Se.

Ashley Marie Ramstad and Jason M. Hiveley, Iverson Reuvers, Bloomington, MN, for Defendants Kevin Stahl, Tyler Johnson, Kevin Lease, and City of Braham.

Pro se Plaintiff Paul Edward Johnson claims that three officers with the Braham, Minnesota Police Department violated his Fourth Amendment rights when they entered a home in which Mr. Johnson was present, searched a portion of the premises, seized and searched Mr. Johnson, and exposed Mr. Johnson to controlled substances. Mr. Johnson alleges the City of Braham is liable for the officers' constitutional violations. Separately, Mr. Johnson claims that one of the officers violated Minnesota law by including false statements in a warrant application.

Defendants seek the dismissal of Mr. Johnson's Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). Because the Amended Complaint fails to plausibly plead

any claims—and it was Mr. Johnson's second attempt to do so—the Amended Complaint will be dismissed with prejudice.

I

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[P]ro se complaints are to be construed liberally, [but] they still must allege sufficient facts to support the claims advanced." *Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004) (citations omitted).

Before describing the facts, it is helpful to make clear where those facts may come from and why. Considering "matters outside the pleadings" generally transforms a Rule 12(b)(6) motion into one for summary judgment, but not when the documents are "necessarily embraced" by the pleadings. *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (quotation omitted); *see* Fed. R. Civ. P. 12(d). Where no party refutes their authenticity or completeness, *see Scott v. Harris*, 550 U.S. 372, 378 (2007); *Abdullah v. Lepinski*, No. 23-cv-121 (ECT/DTS), 2023 WL 5515895, at *1 (D. Minn. Aug. 25,

2

2023), police body-worn videos "of an incident are necessarily embraced by the pleadings" and may be considered in adjudicating a motion for judgment on the pleadings, *Ching ex rel. Jordan v. City of Minneapolis*, 73 F.4th 617, 621 (8th Cir. 2023).

When events are recorded by an officer's body-worn camera, the facts will be viewed in the light depicted by the recording, setting aside fact versions that are "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott*, 550 U.S. at 380; *see, e.g., Ransom v. Grisafe*, 790 F.3d 804, 807 (8th Cir. 2015). Inconclusive video evidence must be construed in the plaintiff's favor. *See Sok Kong Tr. ex rel. Map Kong v. City of Burnsville*, No. 16-cv-03634 (SRN/HB), 2018 WL 6591229, at *9 (D. Minn. Dec. 14, 2018), *rev'd and remanded on other grounds*, 960 F.3d 985 (8th Cir. 2020). Here, no party disputes the authenticity or completeness of the officers' body-worn camera recordings. Accordingly, except for events not captured by the body-worn cameras, the facts are drawn from those recordings.

II

On March 25, 2023, Mr. Johnson was with his girlfriend, Marcie Henning, and Ms. Henning's aunt, Donna Van Asch. *See* Am. Compl. [ECF No. 64] ¶¶ 15, 17. All three were at Ms. Van Asch's residence. *Id.* Mr. Johnson called the Braham police to Ms. Van Asch's house to "take a report and to have dangerous substances that are illegal . . . removed from the home for proper investigation and disposal."[1] *Id.* ¶ 19. Braham Police

---

[1]     In opposition to Defendants' motion, Mr. Johnson submitted a brief previously filed in Minnesota state court that includes the following portion of the 911 call transcript:

Department Officers Tyler Johnson and Kevin Lease responded to Mr. Johnson's call at approximately 2:35 p.m. *Id.* ¶ 20. When they arrived, Mr. Johnson opened the door and invited the officers inside. ECF No. 71-1 at 0:31–53.

While standing in the kitchen on the ground floor of Ms. Van Asch's home, Mr. Johnson told the officers of an "invasion" at his Minneapolis home by individuals involved in drug activity and check forgery. *Id.* at 0:54–16:00. Mr. Johnson reported that these activities had been going on since 2021, and that the perpetrators had written $40,000 worth of forged checks to purchase vehicles. *Id.* at 3:40–56, 8:51–58, 10:00–20. Mr. Johnson

---

**Dispatch**: Ok, well sorry about that. So someone stole money from you, or somebody else?

**Paul Johnson**: From Donna Vanesh. Ok, ahh, check forgery thing and they left a bunch of property in the house. What they do is they, using their property [?] ah, in [effort?] to reenter the home. um. On multiple occasions ah, they're writing checks, forging checks using her account number. And we have evidence of one such check.

**Dispatch**: How did

[inaudible]

**Dispatch**: Are these, are these, are these people still, are they there right now, or?

**Paul Johnson**: They're not here, but their property is here. and we would like an officer to come get all the evidence from the property as well. **As um, the drug paraphernalia they left here with heroin or fentanyl on the foil.**

ECF No. 78-4 at 2 (emphasis in original); *see Zean*, 858 F.3d at 526 (noting that "matters of public record" may be considered in deciding a Rule 12(b)(6) motion (quotation omitted)).

explained that he had since been kicked out of his Minneapolis house, that one of the individuals involved in the drug activities and check-forging scheme, Sue Sonterre, had migrated to Ms. Van Asch's home, *id.* at 5:00–5:06, and that Ms. Sonterre had left some of her belongings there, *id.* at 2:41–2:48. Mr. Johnson stated that Ms. Sonterre was addicted to methamphetamine, heroin, and fentanyl. *Id.* at 46:14–27. While at Ms. Van Asch's home, Mr. Johnson reported that he had gone through Ms. Sonterre's belongings intending to turn them over to law enforcement "for evidence." *Id.* at 3:31–39.

Mr. Johnson asked the officers to follow him to the basement, and they did. *Id.* at 25:08–21. Bags, clothes, luggage, boxes, and assorted belongings were strewn about the basement; Mr. Johnson pointed to bags on a bench near the stairwell, and stated that one of the bags contained "drug paraphernalia" including "heroin on foils." *Id.* at 25:12–51. Mr. Johnson told the officers that the bags had been pulled from Ms. Sonterre's belongings that had been left at Ms. Van Asch's home. *Id.* at 25:33–35. Officer Lease picked up two of the bags on the bench and inspected the items contained within them. *Id.* at 26:00–22. The first bag was labeled "Overdose Response Naloxone Kit" and contained syringes; the second was a clear bag containing naloxone. *Id.* Based on these findings, Officer Lease called Chief of Police Kevin Stahl and communicated his findings and assessment of the situation. *Id.* at 29:41–32:03.

Officer Johnson began going through the brown paper bag that Mr. Johnson said contained foils; he dumped the bag's contents out and inspected them. *Id.* at 36:48–41:50. Mr. Johnson explained the reason he, Ms. Henning, and Ms. Van Asch had gone through Ms. Sonterre's belongings was to make sure she hadn't taken anything from Mr. Johnson's

Minneapolis house or from Ms. Van Asch's residence. ECF No. 71-2 at 42:20–30. Officer Johnson asked Officer Lease to retrieve a drug test kit from his vehicle. *Id.* at 41:55–42:00. In response, Mr. Johnson stated he had a fentanyl test kit, as he had "seen one in the drawer right there." *Id.* at 42:03–12. Mr. Johnson also grabbed a cup from a shelf in Ms. Van Asch's basement stating he "touched it once already" and that the straw in the cup had narcotics on it. *Id.* at 43:04–17. Mr. Johnson then handed the cup to Officer Johnson. *Id.* at 43:16–18. Shortly after, Officer Johnson observed that Ms. Henning was holding two tins. *Id.* at 43:28–46. He directed Ms. Henning to let him see the tins before she took them upstairs. *Id.* at 43:44–46. Ms. Henning handed the tins over and Officer Johnson discovered a glass pipe inside one of them. *Id.* at 43:44–44:05.

A few minutes later, Chief Stahl arrived. ECF No. 71-1 at 49:38. Mr. Johnson directed Ms. Henning and Ms. Van Asch to go upstairs and said he would "talk to the gentlemen about this stuff." *Id.* at 49:44–48. At Chief Stahl's direction, Officer Lease tested the pipe found in the tin. *Id.* at 55:28–57:38. The pipe tested positive for methamphetamine. *Id.* at 57:33–35; Am. Compl. ¶ 34. Chief Stahl then directed that Mr. Johnson, Ms. Henning, and Ms. Van Asch all be placed under arrest. ECF No. 71-1 at 57:27–50. Officer Johnson handcuffed Mr. Johnson, ECF No. 71-2 at 58:10–29, after which Officer Lease searched Mr. Johnson, ECF No. 71-1 at 58:23–59:57. Mr. Johnson was detained for two days before he was released without charges. Am. Compl. ¶¶ 40–41.

Mr. Johnson asserts claims under 42 U.S.C. § 1983 for unlawful entry into and search of Ms. Van Asch's residence, unlawful search and seizure of his person, false imprisonment, and excessive force. *Id.* ¶¶ 46–69. Mr. Johnson also brings a claim under

Minn. Stat. § 609.43 for false statements made in a warrant application to search Ms. Van Asch's residence. *Id.* ¶¶ 70–73.

III

Before turning to the merits, it is necessary to address a procedural problem. Mr. Johnson's response memorandum includes allegations—or arguments based on allegations—that are not in the Amended Complaint. These include: (1) that the officers conspired against him; (2) that Officer Johnson has mishandled evidence in the past; and (3) that the City of Braham Police Department's internal investigation of the incident demonstrates pervasive misconduct. *See* ECF No. 77.

A party cannot defend a complaint by relying on a brief, affidavit, or other documents that describe additional or different allegations that are not in the complaint. *See Al-Saadoon v. Barr*, 973 F.3d 794, 805 (8th Cir. 2020) ("[I]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." (alteration in original) (quotation omitted)); *see also In re Agape Litig.*, 773 F. Supp. 2d 298, 316 (E.D.N.Y. 2011) ("It is well-settled that a plaintiff cannot amend the complaint through briefs and affidavits, and 'such facts are thus irrelevant for purposes of determining whether [the Plaintiff's] [c]omplaint should be dismissed for failure to state a claim.'" (alterations in original) (quotation omitted)). The additional factual allegations in Mr. Johnson's brief that are not in, or derived from allegations in, the Amended Complaint will not be considered.

IV

A

Mr. Johnson claims the officers unlawfully entered and searched Ms. Van Asch's home without securing a warrant. Am. Compl. ¶¶ 57, 59. This claim is dismissal-worthy because Mr. Johnson has not alleged facts plausibly showing he has Fourth Amendment standing to challenge the entry and search of Ms. Van Asch's residence.

"[A] person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search," *Byrd v. United States*, 584 U.S. 395, 410 (2018), because "Fourth Amendment rights are personal and cannot be asserted vicariously," *United States v. Pierson*, 219 F.3d 803, 806 (8th Cir. 2000). "A person challenging the constitutionality of a search must demonstrate that he or she possessed a legitimate expectation of privacy in the particular area searched." *United States v. Nabors*, 761 F.2d 465, 468 (8th Cir. 1985) (citing *Rakas v. Illinois*, 439 U.S. 128, 148–49 (1978)). To meet this burden, Mr. Johnson "must establish (1) he himself 'asserted a subjective expectation of privacy' 'in the place searched or object seized,' and (2) his 'subjective expectation is objectively reasonable.'" *United States v. Douglas*, 744 F.3d 1065, 1069 (8th Cir. 2014) (quoting *United States v. Kiser*, 948 F.2d 418, 423 (8th Cir. 1991)). The first inquiry is an issue of fact, and the second is a question of law. *Id.* (citation omitted).

In determining whether a person possessed a legitimate expectation of privacy, a court considers the following factors: "whether the party has a possessory interest in the things seized or the place searched; whether the party can exclude others from that place;

whether the party took precautions to maintain the privacy; and whether the party had a key to the premises." *United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999). These factors and others form a continuum: At one end are overnight guests who may claim Fourth Amendment protection, *Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990), and at the opposite end are those merely on the at-issue premises for a short time for the purpose of a commercial transaction who may not claim such protection, *Minnesota v. Carter*, 525 U.S. 83, 91 (1998); *see also id.* at 90 ("[A]n overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not."). In *Nabors*, the Eighth Circuit held that a guest who did not possess a key or have unrestricted access to the home, was not allowed to visit when the owner was not home, visited two or three days a week without staying the night, and did not receive mail or keep personal belongings at the home, lacked Fourth Amendment standing to challenge a search of the home. 761 F.2d at 469–70.

Drawing on the analysis in *Nabors*, as well as the factors to be considered, Mr. Johnson has not alleged facts plausibly showing he had a legitimate expectation of privacy in Ms. Van Asch's home (nor has he addressed this important question in his brief). Mr. Johnson was not an overnight guest; Ms. Van Asch stated he was only at her home during the afternoon on March 25. ECF No. 71-2 at 1:31:56–1:32:04. Mr. Johnson has not alleged that he had unlimited access to Ms. Van Asch's home, that he had a key to her home, that he previously spent any time at her home, or that he kept any belongings at her home (apart from a shelving unit, which he brought to the home because he believed it contained

evidence of check fraud).  *See* ECF No. 71-2 at 26:00–15; *see also* ECF No. 71-1 at 8:32–9:21, 53:00–08.

Nor has Mr. Johnson plausibly alleged that he possessed an expectation of privacy in the items searched at Ms. Van Asch's home.  "If a [person] fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally."  *Douglas*, 744 F.3d at 1071 (quoting *United States v. Barragan*, 379 F.3d 524, 529–30 (8th Cir. 2004)).  In *Douglas*, the Eighth Circuit found that, where a defendant had not asserted any interest in the searched property "ownership, possessory, or otherwise," he did not have Fourth Amendment standing to challenge the search of the property.  *Id.* at 1072.

This case is like *Douglas*.  During his encounter with the officers, at no point did Mr. Johnson state the searched items belonged to him; nor does he allege as much now.[2] In the body-worn camera recordings, Mr. Johnson is shown to state clearly that the items belonged to Ms. Sonterre, *see, e.g.*, ECF No. 71-1 at 25:20–22, except for the tins, which may have belonged to Ms. Van Asch, *see* ECF No. 71-2 at 43:20–27.  There is no plausible basis to find that Mr. Johnson had an objectively reasonable expectation of privacy in the area or items searched.  His claims relating to the officer's entry into, and search of, Ms. Van Asch's residence will be dismissed.[3]

---

[2]      The officers did not search the shelving unit.

[3]      If Mr. Johnson had a reasonable privacy expectation in Ms. Van Asch's residence, he consented to the search by calling officers to the property, asking them to enter the house, and requesting that they examine the various contraband or contraband-containing items found in the basement.  *See United States v. Williams*, 521 F.3d 902, 906 (8th Cir.

10

B

The officers argue that Mr. Johnson's claims of unlawful search of his person and arrest should be dismissed because the officers are entitled to qualified immunity. ECF No. 70 at 22–24. In determining whether the officers have qualified immunity, two questions are answered: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional . . . right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (citations omitted); *see also Watson v. Boyd*, 2 F.4th 1106, 1109 (8th Cir. 2021). Courts may consider the questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). A § 1983 plaintiff can defeat a claim of qualified immunity only if the answer to both questions is yes. *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009). "Qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Sok Kong Tr. ex rel. Map Kong v. City of Burnsville*, 960 F.3d 985, 991 (8th Cir. 2020) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)), *cert. denied sub nom. Kong v. City of Burnsville*, 141 S. Ct. 2839 (2021) (mem.). If the material facts are not genuinely disputed, then the constitutionality of an officer's conduct is a question of law. *Thompson v. Reuting*, 968 F.2d 756, 759 (8th Cir. 1992); *see also Pollreis v. Marzolf*, 66 F.4th 726, 732 n.2 (8th Cir. 2023); *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003).

---

2008) ("In order for a consensual search to be valid, consent must actually be given (either express or implied), and the person giving consent must have (actual or apparent) authority to do so."); *see also United States v. Jones*, 254 F.3d 692, 695 (8th Cir. 2001) ("The precise question is not whether [the defendant] consented subjectively, but [objectively] whether his conduct would have caused a reasonable person to believe that he consented.").

"For purposes of the second prong, [courts] look to 'the legal rules that were clearly established at the time' the action at issue was taken." *Graham v. Barnette*, 5 F.4th 872, 881 (8th Cir. 2021) (quoting *Davis v. Hall*, 375 F.3d 703, 711 (8th Cir. 2004)). "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Rivas-Villegas*, 595 U.S. at 5–6 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). As the Eighth Circuit has explained, a plaintiff can show that a right was clearly established in different ways:

> [A] plaintiff may [1] point to existing circuit precedent that involves sufficiently "similar facts" to "squarely govern[ ]" the officer's actions such that the officer had "notice that [his] specific use of force [was] unlawful," *Kisela v. Hughes*, 584 U.S. [100, 105] (2018) (per curiam), [2] present "a robust consensus of cases of persuasive authority" doing the same, *see De La Rosa v. White*, 852 F.3d 740, 745 (8th Cir. 2017), or [3] demonstrate that a general constitutional rule applied with "obvious clarity" to the facts at issue, *see Rokusek v. Jansen*, 899 F.3d 544, 548 (8th Cir. 2018).

*Boudoin v. Harsson*, 962 F.3d 1034, 1040 (8th Cir. 2020).

The Fourth Amendment protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. An arrest becomes unreasonable when it is unjustified by probable cause. *See Thurairajah v. City of Fort Smith*, 925 F.3d 979, 983 (8th Cir. 2019). "A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to

qualified immunity if there is at least 'arguable probable cause.'" *Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011) (quoting *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005)). "An officer has probable cause to make a warrantless arrest when the totality of the circumstances at the time of the arrest 'are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" *Id.* at 523 (quoting *Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 816 (8th Cir. 2010)). "Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is 'objectively reasonable.'" *Id.* (quoting *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008)). Answering whether an arrest was supported by arguable probable cause requires comparing each charge—that is, the state law or laws the officers claim were arguably violated and justified an arrest—with the plaintiff's arrest-prompting conduct, *see, e.g., Robbins v. City of Des Moines*, 984 F.3d 673, 680 (8th Cir. 2021), keeping in mind that "[i]n close qualified immunity cases, the absence of judicial guidance can be significant because '[p]olice officers are not expected to parse code language as though they were participating in a law school seminar,'" *Walker*, 414 F.3d at 993 (second alteration in original) (quoting *Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1108 (8th Cir. 2004)).

Mr. Johnson was arrested for Fifth Degree Drug Possession.[4] Under Minnesota law, possession may be shown through actual or constructive possession. *Branch v. Gorman*,

---

[4] The Amended Complaint alleges Mr. Johnson was arrested for "constructive possession of narcotics." Am. Compl. ¶ 35. Two criminal complaints—one for Ms. Henning, the other for Ms. Van Asch—filed in Minnesota state court and submitted by the officers in support of their motion to dismiss specify that Mr. Johnson was arrested for

742 F.3d 1069, 1072 (8th Cir. 2014) (citing *State v. Florine*, 226 N.W.2d 609, 610 (Minn. 1975)). Minnesota has established a two-part test by which constructive possession may be shown: (1) the illicit substance was found "in a place under defendant's exclusive control to which other people did not normally have access," or (2), that, if the substance was found "in a place to which others had access, there is a strong probability (inferable from other evidence) that defendant was at the time consciously exercising dominion and control over it." *Florine*, 226 N.W.2d at 611. It is well-established that Minnesota requires more than "mere proximity" to the illicit substance to establish constructive possession; some other indicia is required. *Branch*, 742 F.3d at 1072.

Here, the body-worn camera recordings establish that officers had sufficient indicia beyond Mr. Johnson's mere proximity to the contraband to establish arguable probable cause. Mr. Johnson knew—or at least claimed to know—the nature of many items throughout the basement. He knew what was in the brown paper bag, as he showed it to the officers and told them it contained "drug paraphernalia" including "heroin on foils." ECF No. 71-1 at 25:28–33. He also told the officers he had "touched" a straw he claimed had narcotics on it, ECF No. 71-2 at 43:04–17, and that he possessed a fentanyl test kit, *id.* at 42:03–12. These facts show that Mr. Johnson had exercised some control over the items. *See* ECF No. 71-1 at 3:31–39. Mr. Johnson admitted to past substance abuse. *Id.* at 46:50–55; 52:01–10; *see State v. Munoz*, 385 N.W.2d 373, 376 (Minn. Ct. App. 1986) (finding

---

Fifth Degree Drug Possession. ECF No. 72-1 at 3; ECF No. 72-2 at 3. This is consistent with the officers' statements and conversations on the body-worn camera footage. *See* ECF No. 71-2 at 57:56–58:05; 1:18:25–33.

appellant's previous use of methamphetamine relevant in determining the presence of probable cause). The bottom line is that, while Mr. Johnson called the police to report the controlled substances and told the officers they belonged to Ms. Sonterre, the officers were not required to believe Mr. Johnson, *see Just v. City of St. Louis*, 7 F.4th 761, 768 (2021) (citations omitted) (noting that the fact plaintiff called 911 did not "diminish the Officers' probable cause to believe, at the time of [plaintiff's] arrest, that he had committed a crime"), and the circumstances they encountered gave the officers a reasonable belief that Mr. Johnson had committed a crime. Considering the body-worn camera recordings, Mr. Johnson has not (and it is difficult to see how he could) allege facts plausibly showing that the officers are not entitled to qualified immunity.

Because the arrest was reasonably justified, so was the officers' warrantless search incident to arrest of Mr. Johnson. A search incident to arrest is an exception to the warrant requirement. *Riley v. California*, 573 U.S. 373, 382 (2014). "[I]f an officer has arrested an individual, the officer may search the individual's person incident to that arrest and may reach into his pockets." *United States v. Pratt*, 355 F.3d 1119, 1121 (8th Cir. 2004) (citing *United States v. Robinson*, 414 U.S. 218, 226 (1973)). Though the justifications for a search incident to an arrest are concern for officer safety and the need to obtain evidence of the offense, "the presence of either justification need not be established in a particular case." *Id.* Indeed, "[i]t is the fact of arrest that enables the officer to conduct a search, not a particularized suspicion as to the suspect's dangerousness." *Id.* (citing *Robinson*, 414 U.S. at 235–36). While there are limits as to how extensive a search in these circumstances

may be, *see, e.g., Riley*, 573 U.S. at 403, Mr. Johnson has identified no facts plausibly showing that the officers exceeded those bounds.

C

Mr. Johnson asserts a claim for false imprisonment under the Fourth Amendment. Am. Compl. ¶¶ 55, 57, 59, 65. "Although false imprisonment traditionally sounds in state tort law, courts have entertained § 1983 claims for false imprisonment when a plaintiff alleges the denial of constitutional rights." *Snyder v. Snyder*, No. 06-cv-3072 (DSD/JJG), 2007 WL 894415, at *9 (D. Minn. Mar. 21, 2007), *aff'd*, 300 F. App'x 440 (8th Cir. 2008) (citing *Baker v. McCollan*, 443 U.S. 137, 142–43 (1979)). "However, where a claim for false arrest is barred because officers acted with probable cause, 'no false imprisonment claim lies.'" *Id.* (quoting *Anderson v. Franklin County*, 192 F.3d 1125, 1132 (8th Cir. 1999)). Accordingly, because Mr. Johnson's claim of unlawful arrest will be dismissed, so will his claim of false imprisonment.

Though the Amended Complaint indicates that the false imprisonment claim is brought under the Fourth Amendment, the officers addressed it under Minnesota state law as well. *See* ECF No. 70 at 28–29. In this respect, the officers argue that they—and by extension, the City—possess official immunity as a matter of law. "As distinguished from the 'qualified immunity' afforded peace officers when addressing 42 U.S.C. § 1983 claims, under Minnesota law a public official is entitled to official immunity from state law claims when that official is charged by law with duties that require the exercise of judgment or discretion." *Heard v. City of Red Wing*, 393 F. Supp. 3d 785, 792 (D. Minn. 2019) (quoting *Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990)); *accord Ward v. Olson*, 939 F. Supp.

2d 956, 964 (D. Minn. 2013) (quoting *Dokman v. County of Hennepin*, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001)). If an official's actions require the exercise of discretion, he is entitled to official immunity "unless the official committed a willful or malicious wrong." *Heard*, 393 F. Supp. 3d at 792 (citing *Pletan v. Gaines*, 494 N.W.2d 38, 40 (Minn. 1992)).

The officers' actions in arresting Mr. Johnson were discretionary for official-immunity purposes. "Generally, police officers are classified as discretionary officers entitled to [official] immunity." *Ward*, 939 F. Supp. 2d at 964 (quoting *Johnson*, 453 N.W.2d at 42); *see also Yang v. City of Brooklyn Park*, 194 F. Supp. 3d 865, 874 (D. Minn. 2016) ("Under Minnesota law, official immunity protects police officers engaged in law enforcement efforts unless they act with subjective malice." (quoting *Wertish v. Krueger*, 433 F.3d 1062, 1067 (8th Cir. 2006))).

Regarding whether the officers acted willfully or maliciously in executing an arrest, "courts consider whether the official has intentionally committed an act that he or she had reason to believe is prohibited. This contemplates less of a subjective inquiry into malice, which was traditionally favored at common law, and more of an objective inquiry into the legal reasonableness of an official's actions." *Heard*, 393 F. Supp. 3d at 792 (cleaned up) (quoting *Hassan v. City of Minneapolis*, 489 F.3d 914, 920 (8th Cir. 2007)); *see also Brown*, 574 F.3d at 500–01 ("In the context of official immunity, 'willful' and 'malicious' are synonymous, and the Minnesota Supreme Court has defined malice as 'nothing more than the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right.'" (quoting *Rico v. State*, 472

N.W.2d 100, 107 (Minn. 1991))). The malicious-wrong exception to official immunity "anticipates liability only when an official intentionally commits an act that he or she then has reason to believe is prohibited." *Rico*, 472 N.W.2d at 107. "The determination of whether an officer acted maliciously or willfully is usually a question of fact for the jury." *Ward*, 939 F. Supp. 2d at 964 (citing *Elwood v. Rice County*, 423 N.W.2d 671, 677 (Minn. 1988)). Here, the same facts that show the presence of arguable probable cause to support Mr. Johnson's arrest show the officers did not act willfully or maliciously for official-immunity purposes. Mr. Johnson alleges no facts that might plausibly negate this conclusion.

Any vicarious liability claim against the City for false imprisonment also fails. The general rule is that "when a public official is found to be immune from suit on a particular issue, his government employer will enjoy vicarious official immunity from a suit arising from the employee's conduct." *Schroeder v. St. Louis County*, 708 N.W.2d 497, 508 (Minn. 2006) (citing *Anderson v. Anoka Hennepin Indep. Sch. Dist. 11*, 678 N.W.2d 651, 663–64 (Minn. 2004)). Mr. Johnson has identified no reason to depart from this rule. Indeed, in several other cases involving claims of false imprisonment, official immunity has been extended to the government employer. *See Dokman*, 637 N.W.2d at 297; *Whalen v. Langfellow*, 731 F. Supp. 2d 868, 886 (D. Minn. 2010); *Teichberg v. Smith*, 734 F. Supp. 2d 744, 752–53 (D. Minn. 2010).

D

Mr. Johnson alleges the officers violated his Fourth Amendment rights by transferring a "lethal substance" onto him during his arrest. Am. Compl. ¶¶ 57, 59–60,

18

65–68.  The two-prong qualified immunity test applies to excessive force claims, just as it does arrests executed without probable cause.  *See McDaniel v. Neal*, 44 F.4th 1085, 1090 (8th Cir. 2022).  And just as the Fourth Amendment protects against arrests performed without probable cause, it also protects against an officer's use of excessive force in executing the arrest.  *See Graham*, 490 U.S. at 394.  Several settled rules guide the excessive-force analysis. "An officer's use of force violates the Fourth Amendment if it was 'objectively unreasonable.'"  *Pollreis*, 9 F.4th at 747 (quoting *Graham*, 490 U.S. at 394–96).

> Objective unreasonableness is "judged from the perspective of a reasonable officer on the scene," in light of "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade by flight."

*Id.* (quoting *Graham*, 490 U.S. at 396).

Considering the body-worn camera recordings, this claim is implausible for two alternative reasons.  (1) It seems most reasonable to infer that the "lethal substance" to which the Amended Complaint refers is drug residue on the officers' gloves left from their search of items in Ms. Van Asch's basement.  The Amended Complaint alleges the officers' gloves "were contaminated with a lethal substance, due to previous[] searching having contaminated their gloves," and the only contaminants described in the Amended Complaint are drugs or drug residue found on items in Ms. Van Asch's basement.  Am. Compl. ¶ 37; *see id.* ¶ 22 ("[T]here was a discussion as to the lethality of the narcotics left in the home . . . ."); *see also* ECF No. 77 at 23 (stating Mr. Johnson was contaminated with

"a lethal narcotic officers themselves had stated in body camera footage will kill you");
ECF No. 71-1 at 48:48–57 (Officer Lease stating "fentanyl in general will kill you").  But
Mr. Johnson cites no case—and independent research has identified no case—clearly
establishing the proposition that an officer violates the Fourth Amendment's excessive-
force prohibition by touching an arrestee with drug-residue-tainted gloves (or hands).  The
claim, in other words, does not get past the second qualified-immunity question.  (2) As
with the original Complaint, the Amended Complaint does not allege why the substance
might be lethal or that Mr. Johnson suffered any injury—even a *de minimis* injury—
because of the contamination.  *Johnson v. Stahl*, No. 24-cv-1065 (ECT/DJF), 2024 WL
4494241, at *2 (D. Minn. Oct. 15, 2024).  Without these allegations, it is difficult to
conceive of how the officers' use of force might have been gratuitous or excessive in some
other way.  *See Wilson v. Lamp*, 901 F.3d 981, 989 (8th Cir. 2018) ("[I]f the suspect does
not allege injuries from the officer's acts, then the use of force was not excessive." (citing
*Grider v. Bowling*, 785 F.3d 1248, 1252 (8th Cir. 2015)).

E

Mr. Johnson also brings official-capacity claims against the officers.  Because "[a]
suit against a public official in his official capacity is actually a suit against the entity for
which the official is an agent," *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010) (alteration
in original), Mr. Johnson's official-capacity claims against the officers are really against
the City.  However, "[a] Section 1983 claim against a municipality cannot be based on
vicarious liability.  But a municipality may be subject to Section 1983 liability if either the
inadequate training of its employees, a municipal policy, or an unofficial municipal custom

causes a constitutional injury." *Ash v. City of Duluth*, 331 F. Supp. 3d 935, 940 (D. Minn. 2018) (citations omitted).

Mr. Johnson's official-capacity allegations are insufficient. He alleges that Officers Lease and Johnson can "be seen handling evidence left behind in the squad car that was from another crime scene," in violation of police procedure. Am. Compl. ¶ 44. The body-camera recordings are inconclusive as to whether the squad car contained evidence from another case. *See* ECF No. 71-2 at 1:18:17–24. However, assuming the recordings support Mr. Johnson's allegation, he has not alleged that a municipal policy caused constitutional injury. Mr. Johnson alleges the opposite—that the officers violated an unspecified municipal policy. *See Fuller v. Hafoka*, No. 19-cv-0886 (PJS/BRT), 2021 WL 3036907, at *8 (D. Minn. July 19, 2021) ("Fuller argues that the defendant officers *violated* the policy, and that it was their *violation* of the policy that caused his injury. As the Eighth Circuit has explained: 'We cannot see how officials' deviation from established policy itself constitutes official municipal policy. If it did, the concept of official municipal policy would be turned on its head.'" (quoting *Bolderson v. City of Wentzville*, 840 F.3d 982, 986 (8th Cir. 2016))), *aff'd*, No. 21-2854, 2023 WL 1487884 (8th Cir. Feb. 3, 2023). Mr. Johnson does not allege the officers were inadequately trained. The closest Mr. Johnson comes to identifying an unofficial municipal custom is the allegation that the "mishandling of evidence . . . show[s] a pattern of poor police conduct and procedure." Am. Compl. ¶ 44. This is not sufficient. A single instance of alleged mishandling of evidence does not amount to a pattern or custom of such conduct. *See Bolderson*, 840 F.3d at 986 (noting

that "[a] single act could not show a continuing, widespread, and persistent pattern of unconstitutional misconduct").

F

Mr. Johnson brings a claim under Minn. Stat. § 609.43, alleging Chief Stahl "under false pretence [sic] fabricate [sic] the statement of probable cause to secure a search warrant" to search Ms. Van Asch's home. Am. Compl. ¶ 71. As Defendants note, however, Minn. Stat. § 609.43 is a criminal statute containing no private right of action. *Clayborne v. Minn. Dep't of Corr.*, No. 23-cv-3612 (JMB/TNL), 2024 WL 3105956, at *5 (D. Minn. June 24, 2024) (dismissing a claim under Minn. Stat. § 609.43 "because Minnesota's criminal statues do not provide individuals with a private right of action" (citing *Larson v. Dunn*, 460 N.W.2d 39, 47 n.4 (Minn. 1990))); *see also Wilson v. McRae's US Mail Serv. Inc.*, No. 20-cv-1664 (PJS/KMM), 2020 WL 6808861, at *5 (D. Minn. Oct. 29, 2020) (recognizing that, in Minnesota, "[a] criminal statute does not give rise to a civil cause of action unless the statute expressly or by clear implication so provides" (quoting *Summers v. R & D Agency, Inc.*, 593 N.W.2d 241, 245 (Minn. Ct. App. 1999))), *R. & R. adopted*, 2020 WL 6802395 (D. Minn. Nov. 19, 2020).

V

There is a question whether the Amended Complaint should be dismissed with or without prejudice. Courts ultimately have discretion to decide between a with-prejudice and without-prejudice dismissal. *Paisley Park Enters. v. Boxill*, 361 F. Supp. 3d 869, 880 n.7 (D. Minn. 2019). A dismissal with prejudice is typically appropriate when a plaintiff has shown "persistent pleading failures" despite one or more opportunities to amend,

*Milliman v. County of Stearns*, No. 13-cv-136 (DWF/LIB), 2013 WL 5426049, at *16 (D. Minn. Sept. 26, 2013); *see Reinholdson v. Minnesota*, 01-cv-1650 (RHK/JMM), 2002 WL 32658480, at *5 (D. Minn. Nov. 21, 2002) (adopting R. & R.), or when the record makes clear that any amendment would be futile, *Paisley Park*, 361 F. Supp. 3d at 880 n.7. On the other hand, when a plaintiff's claim "might conceivably be repleaded with success," dismissal without prejudice may be justified. *Washington v. Craane*, No. 18-cv-1464 (DWF/TNL), 2019 WL 2147062, at *5 (D. Minn. Apr. 18, 2019), *R. & R. adopted*, 2019 WL 2142499 (D. Minn. May 16, 2019). Here, the Amended Complaint falls in the former category. Mr. Johnson was given an opportunity to amend, *see Stahl*, 2024 WL 4494241, and he has not identified facts or law that might be included in a third version of the pleading to overcome the dismissal-worthy problems of the Amended Complaint.

## ORDER

Therefore, based on the foregoing, and all the files, records, and proceedings herein,

**IT IS ORDERED THAT**:

1.      Defendant's Motion to Dismiss [ECF No. 67] is **GRANTED**.

2.      Plaintiff Paul Edward Johnson's Amended Complaint [ECF No. 64] is **DISMISSED WITH PREJUDICE.**

### LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  May 19, 2025                              s/ Eric C. Tostrud
                                                 Eric C. Tostrud
                                                 United States District Court